# AMERICAN ARBITRATION ASSOCIATION
## BEFORE ARBITRATOR MICHAEL T. LOCONTO

---

**In the Matter of the Arbitration between**

**BERKLEE FACULTY UNION, LOCAL 4412, AMERICAN FEDERATION OF TEACHERS-MASSACHUSETTS, AFL-CIO,**

**and**

**BERKLEE COLLEGE OF MUSIC.**

AAA Case No. 01-24-0004-7078.

Issue: Merits – Berklee Online Courses for Continuing Students (Class Action).

---

### AWARD OF THE ARBITRATOR

The Employer violated the Agreement.

The Employer shall immediately cease and desist from permitting continuing students enrolled on the Boston campus from transferring credits earned through the completion of Berklee Online courses for credit toward a Berklee degree.

Michael T. Loconto, Esq.
Arbitrator
Dated: October 24, 2025

**In the Matter of the Arbitration between**

**BERKLEE FACULTY UNION, LOCAL 4412,**
**AMERICAN FEDERATION OF TEACHERS-**
**MASSACHUSETTS, AFL-CIO,**

|  | **OPINION** |
| **and** | **AND** |
|  | **AWARD** |

**BERKLEE COLLEGE OF MUSIC.**

AAA Case No. 01-24-0004-7078 (Berklee Online Coursework for Continuing Students; Class Action – Decision on the Merits).

---

The parties submitted this matter to arbitration pursuant to Article 11 of the collective bargaining agreement ("Agreement"), effective September 1, 2022 through November 3, 2025, between the Berklee Faculty Union of the American Federation of Teachers, Local 4412, AFT-MA, AFL-CIO (the "Union") and the Berklee College of Music (hereinafter "Berklee" or the "Employer"). The Union filed the underlying grievance alleging that the Employer violated the Agreement by allowing continuing students to transfer courses completed through Berklee Online for credit toward satisfaction of traditional degree requirements, thereby effectuating a diminution of bargaining unit work.

The parties mutually agreed to bifurcate this matter on the issue of arbitrability and proceeded with an in-person hearing at the offices of the Foley Hoag law firm in Boston, Massachusetts on September 11, 2024. Allison Anderson, Esq. of Foley Hoag appeared on behalf of the Employer. Al Gordon O'Connell, Esq. of the Boston law firm Pyle Rome Ehrenberg P.C. appeared on behalf of the Union. An Opinion and Interim Award issued on December 23, 2024 established the arbitrability of the underlying dispute.

On July 1, 2025, the parties reconvened for a second day of hearing at the Foley Hoag offices in Boston. Post-hearing briefs were filed by the parties on September 17, 2025, at which time the Arbitrator declared the record closed.

**ISSUES**

The parties agreed upon the issues for resolution. The first issue on arbitrability was resolved by the Opinion and Interim Award on December 23, 2024. The remaining issue in dispute is as follows:

> Did the College violate the collective bargaining agreement between Berklee College of Music and the Faculty Union by permitting continuing students to transfer Berklee Online classes for credit? If so, what shall be the remedy?

**RELEVANT PROVISIONS OF THE AGREEMENT**

> **ARTICLE 37**
> *WAIVER OF RIGHT*
>
> A. The failure by either party to insist in any one situation upon performance of any of the terms or provisions of this Agreement shall not be considered as a waiver or relinquishment of the right of the Employer or the Union to future performance of any such terms or provisions, and the obligation of the parties to such future performance shall continue. It is understood that neither party gives up the right to argue to prove the assistance of a past practice or lack thereof.
> …
>
> **MEMORANDUM OF UNDERSTANDING #3**
> *ONLINE COURSES/BERKLEE ONLINE*
>
> Berklee plans to introduce into the curriculum on-line courses for credit which current students may enroll in. Berklee intends to implement these on-line courses in the following manner.

1. The normal College academic process must review and approve the on-line course prior to it being introduced into the curriculum.
2. Full-time and part-time faculty will be assigned to teach an on-line course only if the faculty member agrees to do so.
3. The on-line course will be part of a faculty members teaching workload consistent with Article 25 if full-time faculty or Article 26 if part-time faculty of the Agreement.
4. The on-line course's class size will be consistent with Article 24, Section C of the Agreement.
5. A part-time faculty member assigned to teach an on-line course will be paid their hourly rate consistent with Article 35 of the Agreement.

In addition, the College plans to accept Berkleeonline.com on-line courses for credit for entering students consistent with the terms of a Curriculum Transfer Agreement. Berklee also plans to accept Berkleeonline.com on-line courses for credit for former Berklee students in order to make it possible for the student to complete certain Berklee degree requirements. Berklee's existing residence requirements will apply.

## BACKGROUND[1]

Berklee College of Music, the Employer, is a leading institution of higher education focused on music instruction. Founded in 1945, Berklee operates four campuses worldwide, with flagship facilities in Boston. The Boston campus includes the Boston Conservatory, which the Employer acquired in 2015. Satellite campuses are located in New York City; Doha, Qatar; and Valencia, Spain. Berklee's institutional enrollment is comprised of approximately 6,000

---

[1] The December 23, 2024 Opinion and Interim Award on arbitrability set out many of the basic facts that are relevant to this dispute and are incorporated hereunder. I have also reproduced certain factual assertions from the November 28, 2022 Opinion and Award of Arbitrator Mark Grossman (hereinafter, "*Valencia Award*") and included other facts developed from the hearing transcripts and record exhibits in that dispute.

undergraduate and graduate students.[2]  The vast majority of matriculated, traditional undergraduate students are enrolled at the Boston campus and are hereinafter referred to as "continuing students."  The parties refer to first-year students as "entering students," and this dispute also includes references to "former students."  David Bogen is Berklee's provost and served as the institution's interim president during the first day of hearing on arbitrability. Robert Lagueux is vice provost.

The Employer also operates an online learning platform, Berklee Online ("BO").  BO has an additional enrollment of approximately 4,000 students.  BO operates as a separate entity and is led by Senior Vice President Debbie Cavalier, who reports to Berklee's president.

Teaching faculty based on the Boston campus[3] are members of the Berklee Faculty Union, an affiliate of the American Federation of Teachers-Massachusetts.  Local 4412 was organized in 1985.  William Silvio is the Union's president and a full professor in Berklee's harmony and jazz department on the Boston campus.  Members are covered by a collective bargaining agreement between the Employer and the Union and are separated into two bargaining units according to part-time or full-time employment status.  Part-time members receive compensation determined by their assigned teaching load, while full-time members receive an annual salary.  All faculty are subject to contractual restrictions on course load and student load.

*Teaching Conducted by Non-Union Faculty on the Boston Campus.*  Union faculty teaching duties are limited by the Agreement.  For the fall and spring academic semesters, full-

---

[2] The Opinion and Interim Award in this dispute overstated the institutional enrollment; the parties corrected my error during the July 1, 2025 hearing on the merits.

[3] Although it is not relevant to this dispute, the Union's post-hearing brief noted that a small number of faculty based at Berklee's New York City campus have recently joined the Union.

time faculty may teach courses valued at up to 18 teaching units per week; part-time faculty members may teach up to 17 units per week. The Agreement does not guarantee that Union faculty members will receive a minimum number of assigned teaching units during each academic semester.

Conversely, individuals who are not members of the Union may also teach on the Boston campus. Specifically, supervisors, staff, visiting professors and artists-in-residence on the Boston campus may perform teaching duties, but are not members of the Union.[4] Berklee department chairs and deans are considered to be supervisory personnel and are not members of either bargaining unit.

**Berklee Online.** The Union does not represent faculty assigned to teach through the institution's online learning platform, Berklee Online. BO was founded by Berklee alumni during the 1990s to provide continuing education opportunities for graduates of the institution. Originally called the Berklee Press, the BO platform was previously located on the internet at the URLs berkleemusic.com and berkleeonline.com and is currently located at online.berklee.edu. Individuals utilize the BO platform for a wide range of continuing education and enrichment activities. Individuals may also pursue a certificate or a degree through BO. Unlike Berklee's traditional undergraduate program, which requires an application and admissions process for matriculated students, the public at-large may attend classes offered by BO. The target audience

---

[4] Article 1 of the Agreement, on Recognition, excludes from the full-time and part-time faculty bargaining units

> all other employees, salaried teaching faculty, managerial employees, non-teaching professional employees, President, Provost, Executive Vice Presidents, Senior Vice Presidents, Vice Presidents, Associate Vice Presidents, Assistant Vice Presidents, Deans, Associate Deans, Assistant Deans, Chairs of Departments, Assistant Chairs of Departments, Executive Directors, Senior Directors, Directors, Associate Directors, Assistant Directors, Academic Administrators, Visiting Professors, Artists in Residence, Endowed Chairs, clerical employees, guards and supervisors as defined in the Act.

for BO coursework is adult learners with some existing level of employment. Berklee does not obligate continuing students to disclose their relationship with the institution when enrolling in BO courses.

BO courses are predominantly offered in an asynchronous learning format, where students may access recorded classroom instruction and other course materials online and learn at their own pace. Some courses offer a hybrid learning component, with students working together in groups. By contrast, traditional Berklee undergraduate courses are typically synchronous, with entering and continuing students attending in-person or online classes taught in real time by institutional faculty members. BO courses are typically offered over a 12-week period four times per year, during the summer, fall, winter and spring semesters. BO class periods are not concurrent with Berklee's traditional 15-week spring and fall academic semesters for graduates and undergraduates.

According to Lagueux, the vice provost, continuing students may take BO courses for a number of reasons – for example, a student who tours with a musical artist and is temporarily not present on the Boston campus for in-person learning. Lagueux added that continuing students are limited by the time that they have available to complete BO courses, because a full-time course load for enrolled undergraduates requires a minimum of 15 course credits in the Berklee curriculum each semester. Continuing students also face a cost barrier: BO courses are not eligible for financial aid.[5]

---

[5] The Online Course Equivalencies webpage that is maintained by Berklee, *see* fn. 7 *infra* (hereinafter, "equivalency guide"), advises continuing students that

> [r]egistration and billing for these courses are independent of those offered as part of your degree or diploma program. Scholarships and financial aid only apply to your primary enrollment and cannot be used for Berklee Online courses.

*Scheduling BO and Berklee Courses.*  The Berklee registrar's office schedules classes for and maintains enrollment data across the institution but does not oversee the BO registration process.  Theresa Atkinson is Berklee's senior director of academic planning and scheduling and assembles the institution's master schedule with input from department chairs and the registrar's office.  The master schedule includes Boston-based graduate and undergraduate programs and summer programs for matriculated and non-matriculated students, as well as classes on the New York campus.

Creation of the master schedule is a multi-step process that considers the institution's admissions projections for entering students and historical matriculation data.  Entering students who elect to study in Valencia are removed from these projections.  Atkinson then schedules classes for continuing students by consulting enrollment data and conferring with department chairs.  The continuing student class schedule also considers historical scheduling data as well as the characteristics of the currently enrolled continuing students; specifically, declared majors and the completion of degree requirements to date.  Atkinson is constrained by some unknown factors; for example, the unknown needs presented by transfer students or the number of continuing students who will elect to study abroad in a given semester.  The initial draft of the master schedule typically includes a 10% additional "cushion" for scheduled classes that can be reduced as the institution receives actual admissions and enrollment data in a given semester.  Atkinson asserted that she does not take BO courses into account when assembling the schedule for the Boston campus.

*Teaching Through the BO Platform.*  A variety of individuals may teach BO courses, including bargaining unit members on the Berklee faculty, other non-union institutional staff and administrators, and individuals who are otherwise unaffiliated with the institution.  The

collective bargaining agreement does not govern the selection or assignment of individuals who perform work via the BO platform, regardless of whether the individual is a member of the faculty bargaining units. Lagueux is not a member of either bargaining unit but has taught courses through the BO platform. By way of example, Lagueux has an employment agreement to teach BO courses, which is separate and distinct from his primary employment arrangements with Berklee. Other Berklee employees, including bargaining unit members, also execute a separate employment agreement prior to teaching through BO. Specifically, compensation for teaching BO courses is in addition to a Union faculty member's Berklee salary. BO courses taught by Union faculty do not count toward the course load limit or workload requirements in the Agreement. Roughly 10% of the bargaining unit has performed teaching duties through BO.

Teaching on the BO platform may occur in one of two modes. First, BO courses are created by "authors," who develop course content and related instruction materials. Lagueux described the content created by a BO course author as a "very elaborate book" containing written materials and audio-visual supplements tailored to the instructional topic. Course authors also develop assignments for students. Authors receive a flat fee from the Employer upon completing a course and assign ownership of the course and related course materials to the Employer. Authors also receive a royalty payment that is based upon the number of students who register for the course.

Second, Lagueux described the role of "instructors," who facilitate the delivery of individual courses on the BO platform. Instructors provide feedback to students through online discussion and grade student assignments, among other duties. Instructors are also paid a flat fee for facilitating the delivery of a course, but do not receive royalties.

**Memorandum of Understanding.**  In 2005, the Employer and the Union negotiated a letter of agreement to address the introduction of online courses at Berklee.  The letter of agreement was subsequently incorporated in the parties' collective bargaining agreement as Memorandum of Understanding (MOU) #3, which has been reauthorized with minimal change during successor CBA negotiations.  MOU #3 is included in the current Agreement.

The MOU has two components: the first section of the MOU addresses Berklee's process for developing and staffing online courses within the undergraduate program curriculum.  Briefly, the first part of the MOU deals with synchronous courses delivered online for *continuing* students enrolled on the Boston campus.  Union faculty are not required to present courses in an online format, but if they choose to do so, the course is counted toward the faculty member's workload requirements that are set by the Agreement.

The second section of the MOU is relevant to this dispute.  Specifically, the section addresses the process for *entering* and *former* Berklee students to transfer BO courses for credit toward a Berklee degree program.  The MOU does not address the rights of continuing students seeking to transfer BO courses toward degree credit.  The Employer has asserted that continuing students who have completed BO courses have been permitted to submit those courses for credit toward their undergraduate degree for at least a decade.

**Transfer Credits.**  Berklee requires continuing students to complete at least 120 credits of coursework in order to obtain an undergraduate degree.  At least 60 credits must be completed "in residence" – through the courses available to students enrolled on the Boston campus.  Berklee allows continuing students to transfer credits from other institutions or programs to satisfy the remainder of the undergraduate degree requirement, which may include certain basic courses or those required by specific degrees.

Continuing students enrolled in Berklee's undergraduate program do not receive direct credit toward their degrees for completing BO classes. Rather, some BO classes offer course credit that may be transferred to Berklee or other higher education institutions. Berklee has published a Transfer Credit Guide ("transfer guide"), which establishes a process for students to transfer completed coursework from other institutions, including BO, for credit toward the satisfaction of degree requirements. At some point, Berklee began allowing continuing students to request the transfer of BO courses for degree credit. Continuing students transfer BO credits by submitting a completed request form to the registrar's office. A Berklee student may not selectively transfer only certain courses completed through BO. Once a transfer request is initiated, all of a Berklee student's coursework completed through BO is transferred and is included in the calculation of the continuing student's grade point average.[6]

To further aid in this process, the registrar established an equivalency guide[7] that compares certain BO courses with similar classes offered by Berklee. For example, Lagueux authored and has facilitated the BO course on "Music, Self and Society" (OMUTH-201). The equivalency guide lists the Berklee undergraduate course by the same name (LMAS-223) [8] as

---

[6] The equivalency guide, *see fn. 7, infra*, also provides the following "Additional Information About Berklee Online Courses:"

> …
> - Individual classes cannot be selected for transfer. This means all Berklee Online classes that a student has received a grade for will be transferred to their degree audit.
> - All courses taken through Berklee Online will affect your GPA. Courses taken through Berklee Online are Berklee courses and cannot be removed from your transcript.
> …

[7] Berklee maintains a webpage entitled "Online Course Equivalencies" at https://www.berklee.edu/registrar/online-course-equivalencies.

[8] Generally speaking, courses are enumerated with a series of letters to denote the area of study followed by a three-digit code. For example, in the music, self and society course, LMAS refers to the liberal arts and sciences department. The first digit in a course code generally refers to the expected skill level for enrolled students; courses at the 100 or 200 level are introductory, while those at the 300 or 400 level are advanced. Some courses at the 200 level require

equivalent to the BO course.  LMAS-223 is an undergraduate degree requirement at Berklee; as of July 2025, the seven individuals who were listed on the Berklee website as LMAS-223 instructors were Union faculty members in the liberal arts and sciences department on the Boston campus.  Berklee allows a mix of introductory and advanced courses to be transferred from BO for credit.  OMBUS-385, which is a course on copyright law, is an example of an upper-level BO course eligible for transfer; the Berklee undergraduate course equivalent is MB-311.  This course is a "major elective," which is among an identified pool of courses that Berklee requires students seeking a degree in a given major – in this example, music business – to complete.  The Employer estimated that about 200 continuing students request to transfer BO courses for degree credit on an annual basis.

  **Receiving Credit for Courses Delivered Outside the Boston Campus.**  Continuing students may also receive credit toward a Berklee degree for coursework completed outside of the Boston campus.  In addition to BO courses, the transfer guide addresses coursework that may be completed at approximately 20 independent higher education institutions that maintain a curriculum transfer agreement (CTA) with Berklee.  Each CTA limits transfers to identified courses.  Berklee is also a member of the Pro-Arts Consortium, a six-member group of colleges in the Boston area that permits cross-registration for students enrolled in one of the member institutions and seeking credit for pre-approved coursework available at another member institution.  Coursework transferred from the Pro-Arts Consortium does not count toward the calculation of a Berklee student's grade point average.  Transfer students may also apply for

---

prerequisite coursework, and most all advanced courses require completion of prerequisites.  Conservatory courses follow a modified numbering system that is not relevant to these proceedings.

credit toward a Berklee degree based on credits earned through enrollment at another institution.[9] Lagueux estimated that continuing students have transferred credit toward Berklee degrees from at least 100 other institutions over the last decade.

In addition, continuing students may enroll in classes on other campuses within the Berklee system. One example is the Valencia campus, which opened in 2012. The Employer offers graduate programming on the Valencia campus and hosts Boston-based continuing students for semester abroad programming. Entering undergraduates may also complete their first year of study in Valencia. Faculty members on the Valencia campus are not members of the Union. Credit given for courses completed at Valencia and other campuses is Berklee credit; there is no need for a student to request a transfer of credits from another Berklee campus. In other words, Berklee automatically counts credits earned in Valencia, or in New York or Doha, toward a Boston-based degree.

**Continuing Students Transfer BO Courses Toward Berklee Degree Credit.** The Union became aware of Berklee's practice of allowing continuing students to transfer credit from BO on at least three occasions prior to the filing of the underlying grievance in this dispute.

*Valencia Award.* First, the Union and the Employer engaged in a separate dispute that focused on Berklee's assignment of non-union Valencia-based faculty to teach online, synchronous courses to Boston-based continuing students. Briefly, the COVID-19 pandemic accelerated the adoption of online learning in higher education. During the Spring 2020 academic semester, Berklee closed its campuses and temporarily suspended in-person learning.

---

[9] Generally speaking, students may also take a placement test to exclude participation in certain basic level courses and may also be excluded from the same for successfully completing advanced-placement coursework in high school. It was not made clear whether these exceptions grant credit toward the student's degree, but the issue is not pertinent to this dispute.

Berklee delivered all course content online from March 2020 through the remainder of the calendar year. Classes were delivered in a hybrid format on the Boston and Valencia campuses during the Spring 2021 academic semester, with a mix of online and in-person course offerings. At some point, the Union learned that the Valencia faculty were teaching online courses for continuing students who were enrolled on the Boston campus. Most of the affected students lived in China and had not yet returned to the United States for in-person learning due to the ongoing pandemic. The Union filed a grievance, contending that the Employer impermissibly assigned bargaining unit work to non-unit faculty. Arbitrator Marc Grossman denied the Union's claim but limited his November 28, 2022 award to "the facts and circumstances in" that case and stated that the award would not be regarded as "precedent for any other real or potential controversy." *Valencia Award*, at 36.

The Union and Berklee engaged in five days of arbitration hearings during 2021 and 2022. On the first day of the Valencia arbitration hearings, the parties could not agree on an issue. The Union's opening statement framed the dispute as two-fold:

> the College outsourced classes for Boston Berklee students to, one, faculty at its Berklee Valencia college in Europe who are not represented by the Union and are not in the bargaining unit, and by outsourcing courses through Berklee Online to continuing Berklee students. Berklee Online is also outside the bargaining unit, outside bargaining unit work, and the action is prohibited by a memorandum of agreement within the collective bargaining agreement.

During the subsequent hearing, Union President Silvio testified that the Union's position on the effects of MOU #3 had been conveyed to then-Vice President for Academic Affairs and Provost Larry Simpson during the Step 3 grievance hearing. Specifically, Silvio asserted that continuing students were not permitted to transfer credit for BO courses; MOU #3 only permitted entering or former students to transfer BO courses toward Berklee degree credit.

The Employer argued that the parties had established a practice of allowing continuing students to transfer BO courses toward degree credit, with records indicating that 137 continuing students transferred BO credits in 2021; 176 in 2020; and 139 in 2019; 100 in 2018; and 43 in 2017. Employer witnesses testified about the establishment of the transfer guide and the Employer's practice of accepting coursework from continuing students who took courses for credit at other institutions, including BO.

The arbitrator ultimately ruled on procedural grounds that the Berklee Online issue was not properly before him. The Union's grievance and demand for arbitration failed to mention Berklee Online within the context of the alleged contract violations, and the arbitrator further noted that excluding the issue from his award was consistent with the Article 11.C.H. prohibition on adjusting multiple grievances during a single arbitration.

In July 2022, after the close of the Valencia hearings but prior to the issuance of the arbitrator's award, the parties began negotiations over a successor collective bargaining agreement. On November 16, 2022, just prior to the issuance of the *Valencia Award*, the parties settled on the terms of the new CBA. MOU #3 remained unchanged following the execution of the 2023-2025 CBA. Berklee Provost Bogen joined the institution during the course of those negotiations. He testified at the arbitrability hearing in the present dispute that the issue of continuing students transferring BO courses for degree credit was not discussed at the table. Bogen has also met with Union President Silvio on a monthly basis to discuss midterm contract administration issues. BO credits for continuing students have not been discussed during these labor-management meetings.

*Union Information Request.*  On October 27, 2023, the Union requested certain

information from the Employer relating to continuing student requests to transfer BO courses for

degree credit.  The request sought:

> 1.  The number of continuing Berklee students who are currently
>     taking Berklee Online courses for credit?
> 2.  A copy of the college's curriculum transfer agreement with
>     Berklee Online.

The Employer responded on December 20, indicating

> 1.  None.  Active Berklee College of Music students may choose to
>     take a Berklee Online class, at their own discretion, and once
>     completed request to transfer the credit toward their BCM
>     [Berklee undergraduate] degree, if in an eligible course.  BECM
>     students do not earn BCM credit for the BOL [Berklee Online]
>     class, while enrolled in the BOL class.
> 2.  Berklee's arrangement for transferring courses from BOL to
>     BCM are reflected in the attached Transfer Credit Guide and
>     here            (https://www.berklee.edu/registrar/online-course-
>     equivalencies) on the website.

**Union Files a Grievance.**  Union President Silvio filed a grievance with interim

President Bogen on March 5, 2024, alleging the Employer violated Agreement provisions that

include

> Article 1, Recognition; Article 2, Definitions; Article 3, Union
> Securities and Dues Checkoff; Article 9, Minimum Terms; Article
> 24, Working Conditions; Article 25, Workload – Full-Time Faculty;
> Article 26, Workload – Part-Time Faculty; Article 38, Pre Existing
> Rights, Privileges Or Benefits; MOU #3 On-Line Courses/Berklee
> Online and any other articles that may apply.

The Union contended that the Employer's violations were based upon its policy permitting

continuing students to "take Berklee Online courses for credit."  During the hearing on

arbitrability, the Union alleged that it learned of the violation that triggered this grievance from a

bargaining unit member who discovered that a continuing student was enrolled in a higher-level

class despite failing the prerequisite coursework.  The bargaining unit member subsequently

learned that the student completed a BO course that was equivalent to the failed prerequisite and received credit toward their degree program. Silvio also testified during the subsequent evidentiary hearing and asserted that no other faculty members had previously raised similar concerns.

As a remedy, the Union requested that the Employer (1) cease and desist from such practices and (2) make the bargaining unit whole for loss of teaching time and related earnings resulting from the alleged contract violations. During the July 1, 2025 hearing on the merits, the Union abandoned its request for a make whole remedy.

Bogen and Silvio met to discuss the grievance on April 3, 2024, and Bogen denied the grievance on April 18, 2024. Arbitrability was not raised in the Employer's Step 3 denial letter. The Union sought arbitration – Step 4 in the Agreement's grievance procedure – by filing a demand with the American Arbitration Association on April 30, 2024. Arbitrator Michael Loconto was appointed to hear this matter on May 23, 2024.

**POSITION OF THE UNION**

The Union has asserted that the language of the Agreement clearly and unambiguously prohibits the Employer from permitting continuing students to transfer credits earned through Berklee Online toward an undergraduate degree. Specifically, the Union argued that the Employer's actions have amounted to an impermissible transfer of bargaining unit work to non-unit positions.

In support of its position, the Union asserted that MOU #3, the provision in the bargaining unit that governs the transfer of credits from BO, clearly limits the student classifications eligible to transfer such credits – to entering and former students. Conversely, the provision does not permit continuing students to transfer BO credits toward an undergraduate

degree. The MOU only addressed the rights of continuing students to take synchronous online courses for credit, which are not provided through BO.

Although the Union asserted that the provision is clear and unambiguous on its face, the Union has further asserted that traditional principles of contract interpretation render a similar result. First, the Union asserted that specific language in a contract is favored over general language when interpreting the intent of the parties. The MOU clearly specifies that *entering* and *former* students may transfer BO courses for credit toward a Berklee degree; the MOU further specifies that *continuing* students may access online courses in a synchronous setting with Boston-based Berklee faculty. Although the Employer has asserted that continuing students have been permitted to transfer credit from BO for over a decade, the Union only learned about the Employer's practice during the arbitration hearings that preceded the *Valencia Award.*

The Union further asserted that the Arbitrator should give effect to all clauses and words in the Agreement. The parties are sophisticated entities who are represented by counsel and have bargained over and agreed to successive terms of the Agreement. The Union asserted that the parties knew that the language of the MOU was intended to provide some rights to continuing students in online coursework completed in the undergraduate curriculum, and other rights to entering and former students who have completed BO courses. Had the parties intended to provide continuing students with a right to transfer BO courses for credit, they would have specified as much. To read the provision consistent with the Employer's interpretation is to render the parties' distinct language meaningless.

On this point, the Union further asserted that the principle of *expressio unius est exclusio alterius* is applicable. The Union specifically asserted that the parties must have purposefully excluded continuing students when they chose to specify entering and former students in the

MOU's definition of those who are eligible to transfer BO courses for credit.  In other words, by specifically permitting entering and former students to transfer BO courses for credit, the parties specifically excluded continuing students from doing so.

The Union further asserted that the Arbitrator may avoid forfeiture by ruling in its favor. "When a contract term is susceptible of several interpretations and one could result in a forfeiture while another reasonable interpretation would not, the interpretation that avoids a forfeiture or a penalty is preferred by most arbitrators." *The Common Law of the Workplace*, §2.14 (St. Antoine, 2d ed. 2005).  Specifically, by denying the Employer's assertion that it may permit continuing students to transfer credits from BO courses, the Arbitrator may preserve the rights of the bargaining units to teach courses for Boston-based students.  Presumably, the Union obtained some benefit at the bargaining table in exchange for permitting the Employer to offer online education.  By preserving the Union's interpretation of the MOU, Boston-based faculty may continue teaching Boston-based students, and the Employer may continue offering online courses consistent with the terms of the MOU.  By the same token, the Union asserted that reason and equity support a finding that the grievance must be sustained.

Even if the Arbitrator finds that the contract is ambiguous and cannot be resolved through traditional means of contract interpretation, the Union further asserted that permitting continuing students to transfer BO courses for credit toward Berklee degrees constitutes unlawful outsourcing.  Arbitrators generally do not permit the assignment of bargaining unit work to non-bargaining unit employees where there is no explicit right to subcontract expressed in the CBA, as is the case with the parties' Agreement.  *See* Elkouri & Elkouri, *How Arbitration Works*, §13.16.A. (8th ed. 2020).  In the present collective bargaining relationship, the Union has permitted an "exceedingly small" number of non-bargaining unit members to perform teaching

duties in Boston.  By allowing continuing students to transfer BO courses for Berklee degree credit, the Employer has undermined the integrity of the bargaining unit.  As demonstrated by the record, one exemplar course offered through BO can replace a course taught by seven bargaining unit members – and such a course is capable of repetition at minimal cost.  Although the Employer has asserted that there is no distinction between BO courses and courses transferred from other institutions for credit, there are limits on the number and types of courses that can be transferred from other bargaining units.  Berklee also derives revenue from BO courses.  By creating a subsidiary for the delivery of bargaining unit work, the Employer has created an *alter ego*.  It is impermissible for an employer to subcontract work to a subsidiary. *See Clark Foodservice, Inc (Elk Grove, Ill.)*, 2001 WL 36593229 at 10 (Wolff, 2001).

In closing, the Union respectfully requested that the Arbitrator find that the Employer violated the Agreement by permitting continuing students to transfer courses earned through Berklee Online for credit toward their undergraduate degrees.  As a remedy, the Union requested that the Arbitrator order the Employer to cease and desist from permitting future transfers of BO courses for credit toward continuing student degree requirements.

**POSITION OF THE EMPLOYER**

The Employer has argued that the Agreement does not limit its right to make decisions on pedagogy.  Specifically, the Employer asserted that it retains the management right to determine the institutional curriculum, and in particular to determine where and when to accept academic credit toward a student's degree.  The National Labor Relations Board has recognized that union contracts in higher education that contain a management rights clause prevent collective bargaining from "dictat[ing] educational matters." *Trustees of Columbia University*, 364 NLRB 1080, 1089 (2016).  As such, the Employer asserted that the proper forum for the Union to seek

curtailment of the Employer's management rights and academic decision-making is at the bargaining table.

Furthermore, the Employer asserted that the Union is not guaranteed to perform all student instruction on the Boston campus. The parties' Agreement permits non-Union staff, visiting faculty and artists in residence to teach courses in Boston, and the Union does not represent faculty teaching on other Berklee campuses outside Boston. Similarly, the Agreement does not limit outsourcing or subcontracting.

The Employer has also asserted that the plain language of the Agreement permits it to allow continuing students to transfer BO courses for credit toward a Berklee degree. Specifically, the section of the MOU that discusses BO courses does not prohibit continuing students from transferring such courses for credit. Rather, the general language of the MOU reflects a decades-old commitment to expand online learning at the institution. The Employer further asserted that there is a lack of any bargaining history demonstrating an intent to prohibit continuing students from transferring BO courses for credit. The Agreement requires deviations from traditional management rights to be specific and expressly stated in its terms. *See* Article 34.A.

The parties are sophisticated and knew how to bargain for specific terms in a complex Agreement. The Union's case rests on the presumption that continuing students are prohibited from transferring BO courses for Berklee degree credit. This presumption is based on the absence of any reference to continuing students in the MOU section that discusses BO courses. In order to reach this conclusion, the Arbitrator must read the MOU to include a prohibition on such transfers. The Employer asserted that the Arbitrator should not read terms into the Agreement that do not presently exist. *See Elkouri*, at 9.2. Article 11 of the Agreement does not

permit the Arbitrator to "alter this Agreement in whole or in part or to add to or delete any of its provisions or to render any award in conflict with its provisions." *See also* Article 34.A.

Practically speaking, the Employer further asserted that the Union has known since at least 2019, when the transfer guide was published, that continuing students have been permitted to transfer BO courses toward Berklee degree credit. However, the Employer further asserted that the Union has failed to bargain away the Employer's right during successor negotiations. "[I]f the parties enter contract negotiations with knowledge of the practice and no attempt was made to modify it, arbitral precedent holds that the practice becomes an implied term of the contract, which can only be eliminated or modified through negotiations." *See* 2009 AAA LEXIS 760, at *12 (DeTreux, 2009). The Employer further asserted that Article 37 of the Agreement does not excuse the Union's failure to act; on the contrary, the Union's silence implies that the practice of allowing continuing students to transfer BO courses toward Berklee degree credit was "unrefuted and mutually understood."

Finally, the Employer asserted that the Union has failed to demonstrate that the bargaining units have been harmed by permitting continuing students to transfer BO courses for credit towards a Berklee degree. The Employer established that continuing students have transferred BO credits toward Berklee degrees for years, and during that time multiple bargaining unit members have performed teaching duties on the BO platform. Concurrently, the Employer asserted that the Union failed to establish that the bargaining units have lost teaching opportunities as a result of these credit transfers. By failing to establish an essential element of a contract claim, the underlying grievance is neither ripe for consideration nor supported by the record in this matter.

In summary, the Employer respectfully requested that the Arbitrator deny the grievance in full.

**OPINION**

This dispute is focused on the terms and conditions of employment for bargaining unit members. This is not a question of pedagogy, or of the institution's management of student academic concerns. MOU #3, which governs the transfer of student credits earned through Berklee Online, limits such transfers to entering and former students. The Employer impermissibly diverted opportunities to teach Boston-based students away from the bargaining unit by also permitting continuing students to transfer credits earned through BO to satisfy their Berklee degree requirements.

As such, the Agreement has been violated and the grievance is sustained.

**BO Faculty May Not Perform Bargaining Unit Work.** Bargaining unit members perform the lion's share of instruction for continuing students who are enrolled on the Boston campus. It is granted that the Union does not have a monopoly on this work, yet the exceptions are clearly defined and are limited by the Article 1 of the Agreement. Non-union instructors permitted to teach Boston-based students are defined, broadly, as staff and senior academic administrators, visiting faculty, and artists in residence. By comparison, the Agreement does not permit BO authors or instructors to teach Boston-based students.

Boston-based continuing students who do not attend in-person classes in Boston have two other options to earn credit toward their degree requirements: either they attend online courses, which may be taught by bargaining unit members or non-union faculty as defined and limited by the Agreement, or they attend courses in study abroad programs. These alternatives may be distinguished from BO coursework. First, MOU #3 also governs online courses, which are delivered in a synchronous format and are taught by Union and non-union faculty as defined and limited by the Agreement. Second, Boston-based students may seek education on other terrestrial campuses: for example, by enrolling in study abroad programming on the Valencia

campus in Spain, where the Union does not represent the faculty.[10] By comparison, the continuing students seeking to transfer BO credits toward their Boston-based degree requirements do not leave the campus for asynchronous learning. Granted, one example provided by the parties focused on an itinerant student who leaves campus to perform with a traveling musician, and who uses BO classes as a surrogate for in-person learning. Short of withdrawal or a leave of absence, such a student remains Boston-based and is therefore distinguishable from those seeking study abroad opportunities. The student who transfers credits from a previous institution, or from a Pro-Arts Consortium member institution, is also distinguishable on the basis of the limited roster and number of permissible courses eligible for transfer. Aside from the requirement that a student complete at least 60 credits "in residence" in order to obtain a Berklee degree, the number of BO courses are not otherwise limited by the institution.

Significantly, the Employer derives revenue from BO courses. Although the parties did not compare the economics of running BO courses against Boston-based synchronous learning in great detail, it is clear that the off-the-shelf nature of an asynchronous BO course permits the institution to offer comparable educational products to Boston-based continuing students at a lower cost than in-person or online synchronous courses taught by bargaining unit members. The lower costs are primarily derived from labor savings, given that BO courses may be run in successive semesters using the course author's assigned materials. The Agreement sets forth wage rates for bargaining unit members once a course has been assigned; by comparison, BO authors and instructors execute individualized employment agreements that are not governed by

---

[10] As Arbitrator Grossman recognized in the *Valencia Award*, the unique circumstances presented by the COVID-19 pandemic limited the effect of his award in future proceeds that involved the performance of bargaining unit work on the Boston campus by non-union personnel.

the CBA.  Simply put, redirecting bargaining unit work to a subsidiary work unit in a manner that circumvents superior employee benefits and other contractual employment terms is impermissible in an organized workplace.

*Subcontracting.*  The CBA does not include any provisions addressing the Employer's right to engage in subcontracting or outsourcing bargaining unit work.  Arbitrators are divided on the question of whether a management rights clause preserves the right of an employer to assign work traditionally performed by a bargaining unit to other workers.  *See Elkouri*, at 13.16.A.

Article 1 of the Agreement broadly defines the bargaining unit, with limited exclusions for the performance of bargaining unit work – that is, teaching to students on the Boston campus. Article 34 provides that

> All management rights, powers, authority and functions, whether heretofore or hereafter exercised, and regardless of the frequency or infrequency of their exercise, shall remain vested exclusively in the Employer.

These rights may only be "expressly and specifically limited by" the terms of the Agreement. The central focus of this dispute are the negotiated parameters for certain students to transfer BO credits toward a Berklee degree.  Although the parties expressed these limitations in the context of student rights, the practical effect of MOU #3 is to preserve opportunities for bargaining unit members on the Boston campus to teach Boston-based continuing students.

**The MOU Defines Transfer Rights Among Student Classifications.**  While negotiating the language of MOU #3, the parties developed a critical distinction among student classifications relative to the transfer of Berklee Online credits.  Specifically, the MOU mentions continuing students in the context of synchronous online coursework, which is principally taught by bargaining unit members in a manner that is consistent with in-person learning on the Boston

campus. The MOU is silent, however, on the right of continuing students to transfer credits earned through BO coursework toward their Berklee degree requirements.

By comparison, the MOU specifically noted the rights of *entering* and *former* students to transfer BO courses for credit toward their Berklee degree requirements, to the evident exclusion of *continuing* students. The parties acknowledge the sophisticated nature of their bargaining partners and the maturity of the Agreement. To this end, the parties used specific language to identify the limited classifications of students who are eligible to transfer BO courses for credit toward Berklee degree requirements. The MOU identifies continuing students in the section that precedes the discussion of BO, yet the parties did not include any reference to continuing students in the provision at issue. The principle of e*xpressio unius est exclusio alterius* is clearly applicable in this regard.

Likewise, it is not necessary to add terms to the Agreement in order to reach this result. Interpreting the silence of the MOU on the rights of continuing students to transfer BO courses toward degree credit merely requires the parties to read the provision as it is stated: that BO courses may only be transferred for Berklee degree credit by entering and former students. The relative age of the MOU does not detract from the clarity of this distinction. The parties have mutually agreed to reauthorize the MOU during multiple rounds of negotiations for successor CBAs. Although the Employer asserted that the Union failed to negotiate a change to the MOU in 2023, after learning that continuing students were transferring BO course for degree credit, the same may be said of the Employer's failure to clarify the transfer rights of continuing students during previous bargaining cycles. By entering the MOU, the Employer may not have intended to forego the ability to permit continuing students to transfer BO courses for degree credit. Yet by continuing to reauthorize the same language, which was originally negotiated in 2005, the

Employer had equal opportunity to promote clarity by adding continuing students to the roster of individuals eligible to transfer BO courses for credit toward a Berklee degree.

**Harm to the Bargaining Unit and Remedial Action.**  The Interim Award determined that Article 37 of the Agreement permitted the Union to challenge the Employer's expansion of transfer rights for continuing students.  Although the Employer asserted that it has engaged in a longstanding and mutually acknowledged practice of allowing continuing students to transfer BO courses for degree credit, the MOU did not permit the establishment of such a practice.

Moreover, the record indicates that the Union did not acquiesce to the Employer's asserted practice.  *Elkouri* provides the classic formulation of a past practice:

> In the absence of a written agreement, 'past practice', to be binding on both Parties, must be (1) unequivocal; (2) clearly enunciated and acted upon; (3) readily ascertainable over a reasonable period of time as a fixed, and established practice accepted by both Parties.

At 12.2, *quoting Celanese Corp. of Am.*, 24 BNA LA 168, 172 (Justin, 1954).  As an initial matter, the Employer asserted that the Union should have known as early as 2019 that continuing students were permitted to transfer BO courses toward degree credit.  The Employer published its transfer guide that year.  Simply put, the Union is not obligated to scrutinize student-facing institutional materials for the purpose of detecting violations of the Agreement.  It is also reasonable to accept, on the same basis, that the Union did not have a working knowledge of transfers that occurred prior to that time.  The record does not reflect that the Employer provided notice to the Union that continuing students would be permitted to transfer BO courses for degree credit.  When the Union learned of the practice during the Valencia arbitration, it sought to challenge the practice but was prevented from doing so on procedural grounds.  The Union then pursued this grievance after learning of the continued practice from a member.

The Employer also asserted that the Union should have pursued negotiations over this change in practice during the most recent round of successor negotiations. *See* 2009 AAA LEXIS 760 at *12 (DeTreux, 2009); *see also Ohio, Local Bd. Of Educ.*, 112 LA 996, 998 (Stewart, 1999) (upholding employer's interpretation of contract term where union never grieved or challenged practice). The cases cited by the Employer are distinguishable from the present dispute. As noted, the Union challenged the asserted practice in a previous dispute. While the Union was prevented from pursuing its claim on procedural grounds in the *Valencia Award*, Article 37's unique language provided an opportunity to contest the asserted practice in this dispute. By comparison, the contract at issue in the DeTreux award evidently did not contain similar permissive language. Moreover, the arbitrator in that dispute determined that the Employer's practice resolved an ambiguity in the contract that could not be addressed by other means.

Similarly, the lack of demonstrated harm is irrelevant to the determination of a contract violation. The Union's grievance is material and is not a hypothetical exercise; the Employer's transfer and equivalency guides make clear that BO courses are permitted to supplant required courses in the Berklee curriculum. Online learning has grown rapidly across higher education during the pandemic and post-pandemic period of the last five years. This Employer is not immune to these trends: in the decades since Berklee Online was introduced and the parties subsequently negotiated MOU #3, the BO platform has transformed from a source of enrichment and continuing education to a primary source of learning. Individuals may seek degrees or advanced certificates through BO. In many respects, the tentative language of the MOU, which reflected the state of the industry in 2005, has yielded an integral part of the Berklee enterprise.

BO's growth did not occur in a vacuum. Practically speaking, the Berklee Online course taught by Vice Provost Lagueux was offered as an example of one course that may be transferred

as credit toward a Berklee degree. The course in the Berklee curriculum that is equivalent to Lagueux's "Music, Self and Society" course on the BO platform is taught by seven different bargaining unit members; other examples found in the equivalency guide return a similar result. Although the record does not reflect a loss of full-time or part-time faculty positions that directly correlate to transfers from BO courses completed by continuing students, it is reasonable to conclude that continued growth in the number of continuing students interested in transferring BO credits will lead to the erosion of work opportunities for bargaining unit members.

It is a core function of an employee union to guard against such losses. Unlike the allegory of the frog in a pot of water slowly rising to a boil,[11] in this case the Union has reacted to a tangible threat of lost work opportunities and taken reasonable and appropriate action to assert its rights under the Agreement.

---

[11] *The tale of the boiling frog*. Canadian Med. Assoc. J. (2004) (last accessed on October 22, 2025 via PubMed Central, at https://pmc.ncbi.nlm.nih.gov/articles/PMC534568/).

**AWARD**

The Employer violated the Agreement.

The Employer shall immediately cease and desist from permitting continuing students enrolled on the Boston campus from transferring credits earned through the completion of Berklee Online courses for credit toward a Berklee degree.

Michael T. Loconto, Esq.
Arbitrator
October 24, 2025